**William ROUSER, Plaintiff,**

v.

**Theo WHITE, et al., Defendants.**

**No. CIV S-93-0767 LKK GGH P.**

United States District Court,
E.D. California.

May 15, 2009.

Jennifer Lauren Riggs, Jones Day, Los Angeles, CA, Richard G. Bates, Jr., Law Offices of Richard G Bates Jr., Concord, CA, for Plaintiff.

David A. Carrillo, Fiel Dizon Tigno, Attorney General's Office of the State of California, Joshua Casey Irwin, Department of Justice Office of the Attorney General, Oakland, CA, James Edmund Flynn, Attorney General of The State of California, Sacramento, CA, Carlotta Wells, United States Department Of Justice, Washington, DC, Jonathan T. Foot,

Federal Programs Branch, Washington, DC, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

Plaintiff is an inmate at Pleasant Valley State Prison and a member of the Wiccan religion. He has brought suit against defendants, who are current and former Directors of the California Department of Corrections and Rehabilitation and wardens at two prisons, for alleged violations of his civil rights under the federal and state constitutions and alleged violations of the federal Religious Land Use and Institutionalized Persons Act.

Pending before the court is defendants' motion for summary judgment on all seven of his causes of action. The court resolves the motion on the papers and after oral argument.

## I. FACTS AND BACKGROUND [1]

### A. Facts

#### 1. Plaintiff's Religious Faith

Plaintiff is a practicing Wiccan and has been initiated as a high priest in that faith.

The modern American Wiccan religion exists under the umbrella of Pagan faiths and is based on a belief in honoring the earth and its elements. Central to the Wiccan practice is the celebration of eight annual sabbats, or solar festivals, and worship at bi-weekly services called esbats, which are based on lunar phases. According to plaintiff, the most important sabbats in his practice are May 1 and October 31. Declaration of William Rouser In Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Rouser Decl.") ¶ 4. Semiweekly services are a practice of the faith.

Wiccans use several items as part of their religious worship. These include a Book of Shadows, which is a form of spiritual journal, Tarot cards, and items that represent the natural elements, such as salt, feather, herbs, wood, water, and religious medallions. According to plaintiff, other items such as altar cloths, ground eggshell powder, and a Witches Bible are also used. Declaration of Lin Wang In Support of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Wang Decl.") ¶ 6, Ex. 56 (Depo. of William Rouser at 10:5–20); Rouser Decl. ¶ 18. In group worship services, Wiccans may use many items, in-

---

**1.** All facts are undisputed unless otherwise noted.

Each party has objected to various items of evidence tendered by the other. Much of this evidence is not relevant to the disposition of the instant motion (and, in fact, many items of evidence tendered were not relied on by the party tendering them). To the extent that it is, those objections are OVERRULED.

Plaintiff requests the court take judicial notice of certain contents of the following: the CDCR Operations Manual, orders and filings in *McCollum v. Cal. Dep't of Corr. & Rehab.*, No. C–04–3339–CRB (N.D.Cal.), excerpts from "The Book of Card Games" by Peter Arnold, and excerpts from the King James Reference Bible. Plaintiffs have provided copies of all of these materials.

A court may take judicial notice of a fact not subject to reasonable dispute, either be-

cause the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably questioned. Fed. R.Evid. 201(b). A court shall take judicial notice of a judicially noticeable fact "if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d). A court may take judicial notice of orders and filings in another court. *Holder v. Holder*, 305 F.3d 854, 866 (9th Cir.2002).

Here, each of the facts for which plaintiff requests the court take judicial notice may be accurately and readily determined by sources whose accuracy cannot reasonably be questioned. Therefore the court grants the request.

cluding an alter, oil, a bell, candles, a chalice, a drum, crystals, an icon of a deity, and a "tabbared." [2] Plaintiff contends that group worship may also use a fire pit. Wang Decl. ¶ 6, Ex. 56 at 16:1–25. According to plaintiff, the Wiccan practitioner begins each ritual by "casting a circle," in which religious articles that have symbolic meaning are placed. Rouser Decl. ¶ 7.

The parties also dispute how essential group worship is in the Wiccan faith. Defendants have tendered excerpts from plaintiff's deposition, in which he testified that "like any religion," his can be practiced alone. Rouser Depo. at 16:2–5. Plaintiff has tendered evidence emphasizing the importance of group worship, as "[f]ellowship and communion with each other strengthens the individual." Rouser Decl. ¶ 5. According to plaintiff, the purpose of the eight annual sabbats specifically is to worship as a group. *Id.* ¶ 4.

### 2. Plaintiff's Relevant Experiences With the Department of Corrections and Rehabilitation

Plaintiff has been incarcerated by the California Department of Corrections and Rehabilitation ("CDCR") since 1979. Defendant Gomez was the Director of CDCR from April 1991 to January 1997. Defendant Cate is presently the Secretary of CDCR.

#### a. 1992 Grievance

In December 1990, plaintiff was transferred to California State Prison—Sacramento ("CSP–Sac"). In August 1992, he filed a grievance requesting items for practicing Wicca. Specifically, he asked for

incense, candles, Tarot cards, and information on obtaining a Wiccan chaplain and arranging Wiccan services. He did not state whether he sought a paid or volunteer chaplain and, if he sought a volunteer chaplain, whether he knew of a person willing to act in this role. Prior to this, plaintiff had not identified himself as Wiccan on forms in which inmates designated their religion. This grievance was denied at the first level on the grounds that the only cards permitted at the facility were pinochle cards and that incense and candles were not allowed due to security and fire restrictions.

Plaintiff appealed and was again denied. In this denial, CDCR staff informed plaintiff that the only chaplains recognized by CDCR were those for Catholic, Muslim, Protestant, and Native American religions. Plaintiff appealed this denial.

The appeal was denied by the associate warden, on the grounds that the requested items were not allowable personal property at CSP–Sac and that there was no need to hire a Wiccan chaplain. This denial was approved by the chief deputy warden, who signed the form over defendant White's typewritten name. Defendant White had become warden of CSP–Sac three weeks prior, on October 1, 1992.[3] According to defendant White, he had "no personal knowledge of the grievance, did not discuss it with any of the staff whose names are on the grievance form, did not personally participate in its denial, and did not learn of it" until after the filing of the instant suit. Def. White's Response to Pl.'s First Special Interrogatory # 6.

Plaintiff appealed this denial to the Director's level, where it was denied by the

---

**2.** Neither party defines tabbared and the court has been unable to ascertain its meaning through its own research. It is possible that this is an alternate spelling of "tabard," which is a short coat or cape. Merriam–Webster Dictionary (2009).

**3.** He served in this capacity until October 1, 1996. Def. White's Response to Pl.'s First Special Interrogatory # 4.

Chief of Inmate Appeals. According to defendant Gomez, he had delegated disposition of Director's level inmate appeals to the Chief of Inmate Appeals. Declaration of James Gomez in Support of Defs.' Mot. for Summ. J. ("Gomez Decl.") ¶¶ 4–5.

**b. 1993 Grievance**

In March, 1993, plaintiff was placed in administrative segregation pending investigation for disciplinary charges. Prior to this, while housed in the general population, plaintiff had a Wiccan Witches' Bible with him. In April 1993, he submitted a grievance stating that an unidentified officer did not permit him to have his Witches' Bible in administrative segregation, although other inmates in administrate segregation were permitted to have religious texts like the Christian Bible and Muslim Qu'ran. This grievance was denied, on the grounds that the book was "an Occult book on Witches, and therefore is not considered a recognized religion." Declaration of Theo White in Support of Defs.' Mot. for Summ. J. ("White Decl.") ¶ 4, Attachment 1.

Plaintiff appealed and the appeal was denied at the second level on June 25, 1993. The stated reason for the denial was that the practice of religion that requires animal or human sacrifice would not be permitted by CDCR.[4] *Id.* This denial is signed above the signature line for "Theo White, Warden." *Id.* Defendants contend, without tendering any evidence in support of this, that the signature is not defendant White's.

This denial was then reconsidered and on November 16, 1994, plaintiff was issued

the Witches Bible. On April 23, 1996, plaintiff was transferred out of CSP–Sac to Pelican Bay State Prison ("PBSP"). During the time he was housed at CSP–Sac, plaintiff celebrated sabbats and esbats in his cell. He made candles and incense from other items that he was allowed to have. Although defendants have tendered some evidence that plaintiff could also engage in group worship in the yard and other common areas, plaintiff has declared that this was inadequate because he was not given access to articles necessary for the worship rituals. Rouser Decl. ¶ 24. He also declared that, because he and other Wiccan worshipers were not given a designated space in which to worship, any inmate could walk through the group and "desecrate [the] circle and disrupt [the] service." *Id.*

**c. 1997 Grievance**

In May 1997, after his transfer to PBSP, plaintiff filed a grievance after an officer allegedly destroyed a small altar plaintiff had made out of a soup box. A correctional counselor told plaintiff he would be allowed to have an altar.

Between 1996 and 2007, it appears that plaintiff was transferred to a number of different facilities. Plaintiff has tendered evidence that during this time, he was denied at various times access to any group services and permission to make orders for religious items from outside vendors. Rouser Decl. ¶¶ 63–76.

**d. 2007 Grievance[5]**

On June 8, 2007, plaintiff was transferred to Pleasant Valley State Prison

---

4. Plaintiff does not dispute that some passages in the Witches Bible discuss actual or symbolic human and animal sacrifice. *See* Pl.'s Response to Defs.' Statement of Undisputed Facts ¶ 122.

5. In their Reply brief, defendants argue that evidence of incidents that occurred after 1997 is irrelevant to this action, as the court has limited the case to events arising from 1990 to 1997. Defendants reference an order from the court in 2007 to this effect. Defendants' argument is odd, to say the least. First, de-

("PVSP"), where he is currently housed. Defendant Yates is currently the Warden at PVSP.

On June 9, 2007, plaintiff filed a grievance regarding staff at PVSP confiscating some of personal property, including several Wiccan items, upon his arrival at PVSP. This grievance was denied on the grounds that the items had not been approved for religious practice at PVSP. He appealed this denial. The denial was upheld for purported safety concerns regarding several of plaintiff's items (a bag, oil, and magnets).[6] The reviewing officer also found that, since the appeal was filed, two of plaintiff's items had been returned to him.

At some point subsequent, plaintiff also filed a grievance stating that CDCR staff had withheld from him a necklace and other religious articles.[7] Prison officials learned that this had not been shipped to PVSP from plaintiff's previous facility. The necklace was later shipped to PVSP and plaintiff currently has it.

### e. Other Grievances

At present, plaintiff also has a Witches Bible and several other religious texts, Tarot cards, stones and crystals, a wooden wand, a picture of a deity, two altar cloths, sea salt, ground eggshell powder, herbs, and incense. Plaintiff has tendered evidence that he had to wait approximately six weeks for some of the herbs and incense to be provided to him after they arrived in the prison mail room.

Plaintiff has tendered evidence that he filed grievances several times since 2002 about the delays he has experienced in obtaining religious items that he has ordered. Rouser Decl. ¶¶ 38–41, 44–47, 57, 59–60. He has tendered evidence that he has also filed grievances on the basis that some religious items he has ordered from vendors have been returned to the vendors by CDCR staff. *Id.* ¶¶ 38, 47. According to plaintiff, until recently, CDCR staff required that the Muslim Chaplain pick up plaintiff's religious orders from the mailroom and deliver them to him, but that the chaplain refused to do so. Rouser Decl. ¶ 47; Amended Declaration of W. Myers In Support of Defs.' Mot. for Summ. J. ("Myers Decl.") ¶ 18; *see also* Declaration of Kajauna Irvin in Support of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ¶ 6. Since the Muslim chaplain has left, the Protestant

---

fendants themselves tendered evidence in support of their Motion for Summary Judgment that relates to events up to the present. *See* Defs.' Statement of Undisputed Facts ¶¶ 135–167, 172–195. Additionally, although orders have been issued in this case indicating the court's prior understanding that the case dealt with events from 1990 to 1997, *see* Findings and Recommendations and Order, July 11, 2006, 2006 WL 1897125; Order, Sept. 27, 2006, 2006 WL 2790525, as defendants are aware much has changed since that time. The trial originally set for September 18, 2007 was vacated, plaintiff has acquired counsel, and plaintiff through his counsel filed a Third Amended Complaint which made allegations concerning events after 1997. Moreover, in their answer to the Third Amended Complaint, defendants did not raise the issue that this case is limited to allegations surrounding events until 1997. For all of these reasons,

the court is not persuaded that defendants have not had adequate notice of the nature of plaintiff's claims or should be given additional opportunity to respond to them.

6. Plaintiff disputes that safety concerns prohibited his having religious oils. According to plaintiff, Muslim inmates are able to order oils that do not have the Manufacturer's Safety Data Sheet that CDCR staff stated was required for plaintiff. Plaintiff has since been able to obtain his religious oils. Rouser Decl. ¶¶ 36–37.

7. Although defendants reference this grievance, they have not tendered it as evidence to the court. Plaintiff does not dispute the description of the grievance or its resolution. *See* Pl.'s Response to Defs.' Statement of Undisputed Facts ¶ 142.

chaplain has been assigned to retrieve religious orders for plaintiff. Plaintiff has declared that this individual has been "unhelpful." Rouser Decl. ¶ 108; *see also* Declaration of Douglas Hysell in Support of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Hysell Decl.") ¶ 21.

Plaintiff has tendered evidence that in January 2008, plaintiff filed a grievance complaining that he had attempted to place orders for religious items, but that those order forms were sent to the Associate Warden for approval and that the Associate Warden never approved them. Rouser Decl. ¶ 91.

Plaintiff has also tendered evidence that there is a new system in place at PVSP whereby plaintiff submits his order forms to Lieutenant Myers and that orders, once they are delivered to PVSP, are picked up by a single chaplain and distributed to all inmates of a single yard. Rouser Decl. ¶¶ 57–60. According to plaintiff, this new system has resulted in a delay of approximately three months for Lieutenant Myers to approve order forms. Rouser Decl. ¶ 59–60.

### f. Plaintiff's Access to Group Services and Religious Items at PVSP

Defendant Yates has tendered evidence, in the form of his response to plaintiff's interrogatory, that initially after his arrival at PVSP plaintiff was allowed to use the Facility A chapel for group services. Def. Yates Response to Pl.'s First Special Interrogatory # 5. Plaintiff disputes this, declaring that when he first arrived at PVSP, he was not allowed to engage in group services. Rouser Decl. ¶ 83. He has declared that later he was permitted to use a small clerk's office in the chapel, although he was not allowed to utilize candles and other religious items, inhibiting

his ability to have a group service. Rouser Decl. ¶ 85.

Presently, in Facility A, where plaintiff worships, an average of twenty-five to thirty inmates attend weekly Wiccan services, although sometimes there are as few as eight to ten at a single service. Plaintiff and four others are high priests and plaintiff or one of the other high priests usually lead the services. Plaintiff has tendered evidence that PVSP staff announce to the inmate population when some religious services are about to begin, but rarely make such announcements for Wiccan services. Hysell Decl. ¶¶ 14–15.

There is some dispute about what religious items are available to plaintiff and other Wiccans for their worship. Defendants contend that plaintiff has not ordered incense, although plaintiff has declared that he has on several occasions. Myers Decl. ¶ 12; Rouser Decl. ¶ 113. The parties agree that plaintiff and the other Wiccans are permitted to use flowers picked on the yard and food used by other inmates who were worshiping with the Wiccans. They also do not dispute that plaintiff and the Wiccans are trying to locate someone to donate musical instruments that they may use in their services. Plaintiff has declared that he has requested use of a fire pit for religious purposes, which was denied although Native American inmates have access to a fire pit. Rouser Decl. ¶ 61; Declaration of Marcus Barnhardt In Support of Pl.'s Opp'n to Mot. for Summ. J. ("Barnhardt Decl.") ¶ 4.

Defendants have tendered evidence that an outdoor worship area was built at PVSP, to which plaintiff and other Wiccans were allowed access. Def. Yates Response to Pl.'s Special Interrogatory # 5. Plaintiff, however, has declared that his access to this area was limited, as he was often not released during his scheduled worship times,[8] was released significantly late, or

8. The parties do not dispute that Wiccans in Facility A of PVSP are scheduled for group

religious services on Sundays and Mondays every week, from 9:30 A.M. to 11:30 A.M.

required to return to his cell before the end of his scheduled worship time. Rouser Decl. ¶¶ 84, 86–95; Second Declaration of William Rouser in Support of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Second Rouser Decl.") ¶ 3. He has described approximately 46 instances of this type of interference with his group worship, by the court's count. *See id.* Plaintiff has tendered evidence that he and other Wiccan inmates must be escorted by an officer to the outdoor worship area but that, on some occasions, no officer came to escort them, so the inmates were not able to have group worship. Rouser Decl. ¶ 49. Defendants have tendered evidence in response that prior to being escorted to the group worship area, an inmate must signal that he wishes to be released from his cell in order to go to the exercise yard. Declaration of D. Huckabay In Support of Defs.' Mot. for Summ. J. ("Huckabay Decl.") ¶¶ 6–8. According to defendants, there is no evidence nor reasonable inference that Wiccan inmates are specifically not released from their cells, as the officer who would release them would not know why they wish to go to the yard. *Id.* Additionally, defendants have tendered evidence that some Wiccan inmates are late to Wiccan services and cause the officer escorting Wiccan inmates from the yard to the group worship area to delay. Declaration of B. Davis In Support of Defs.' Mot. for Summ. J. ("Davis Decl.") ¶¶ 3–5.

Religious groups at PVSP store the items they use for group worship in lockers. An officer is needed to unlock the Wiccans' locker with a key and give the inmates their items. Plaintiff has tendered evidence that in the past there had been an on-going problem of officers telling plaintiff and the other Wiccans at-tempting to hold group services that they did not have the key to the lockers. Rouser Decl. ¶¶ 49–50; Hysell Decl. ¶¶ 9–10. Plaintiff has declared that he and other inmates continue to experience problems in officers opening their locker prior to the Wiccan services. *Id.* Defendants have tendered a declaration of W. Myers, the Community Partnerships Manager at PVSP, it is now the policy at PVSP that all the religious groups' lockers are secured with keyed locks, although in the past some religious group's lockers had combination locks on them. Myers Decl. ¶ 13. Plaintiff has tendered evidence, however, that at present the locker containing Wiccan items is secured with a keyed lock, the lockers for the Native American and Catholic items is secured with a combination lock, and the locker containing items for Protestant inmates has no lock. Second Rouser Decl. ¶ 4; Hysell Decl. ¶ 7; Irvin Decl. ¶ 17; Declaration of Oliver Vann in Support of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Vann Decl.") ¶ 3. Plaintiff has tendered evidence that the Native American and Catholic inmate clerks know the combination to their locks, so they may access their items without staff assistance. Hysell Decl. ¶ 8. Plaintiff has also declared that on one occasion, the Wiccan's locker was found open and several religious items were missing. Rouser Decl. ¶ 52.

Plaintiff has also tendered evidence that CDCR staff has interfered with his worship on sabbats. On the October 31, 2007 sabbat, plaintiff and other Wiccan inmates were not released from their cells. Rouser Decl. ¶ 88. Although defendants have tendered evidence that the facility was on lockdown that date, plaintiff has tendered evidence that lockdown did not occur until after the sabbat service had been sched-

Inmates who wish to attend the services put their name on a list that is then approved by a captain or lieutenant. Although defendants have tendered evidence that approval is also required by the Muslim Imam, plaintiff has declared that that person is no longer at PVSP. Rouser Decl. ¶ 108.

uled to begin. Rouser Decl. ¶ 88. On the October 31, 2008 sabbat, the Wiccan service was disrupted when officers began playing rock music loudly during it. Rouser Decl. ¶ 96. Defendant have tendered evidence that the officers were later reminded that such actions were inappropriate. Myers Decl. ¶ 16. Finally, plaintiff has tendered evidence that he was not permitted to hold group worship service on the March 20, 2009 sabbat. Second Rouser Decl. ¶ 3, Ex. 46. Defendants have tendered evidence that the prison was on lockdown that day but Community Resources Manager Myers offered to reschedule the service, which plaintiff declined. Reply Declaration of W. Myers In Support of Defs.' Mot. for Summ. J. ("Myers Reply Decl.") ¶ 6.

Volunteer Wiccan spiritual leaders are allowed access to plaintiff and other Wiccans at PVSP. Prior to plaintiff's arrival at PVSP, a volunteer Wiccan spiritual leader attended group service, but he has not returned since. At present, no volunteer Wiccan spiritual advisor has requested to assist in services at PVSP. Plaintiff has not asked any Wiccan volunteers to come to PVSP, although he has declared that he has refrained from doing so out of fear that it could be construed as a rules violation. Rouser Decl. ¶ 110. Defendants have tendered evidence that no Wiccans at PVSP have given the Community Partnership Manager the names of potential volunteers to contact. Myers Decl. ¶ 20. Defendants have also tendered evidence that the Community Partnerships Manager has made efforts to locate a Wiccan volunteer spiritual advisor, to no avail. *Id.* ¶ 21.

Defendants have tendered evidence that paid chaplains are typically at a facility daily, while volunteer spiritual advisors are there more infrequently. Defs.' Statement of Undisputed Facts ¶ 182. Plaintiff has tendered evidence that, in addition to this difference, volunteer spiritual advisors at

PVSP cannot approve religious order forms, retrieve orders from the mailroom, approve or deny grievances, access prison keys, and ensure inmates are released on time for services, all of which paid chaplains may do. Declaration of Patrick McCollum in Support of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("McCollum Decl.") ¶¶ 8–12. Plaintiff has declared that he needs a paid chaplain, specifically, to retrieve religious orders, make copies of religious texts, contact entities outside of PVSP to seek donations, and otherwise facilitate his group worship. Rouser Decl. ¶¶ 104–112. Defendant has tendered evidence that staff chaplains, although they are affiliated with particular faith, are required to assist inmates of all faiths and that the chaplains do this. Declaration of Barry Smith in Support of Defs.' Mot. for Summ. J. ("Smith Decl.") ¶ 11; Declaration of Lon Moskowitz in Support of Defs.' Mot. for Summ. J. ("Moskowitz Decl.") ¶ 14; Declaration of Kamal Abdul–Jabbaar in Support of Defs.' Mot. for Summ. J. ("Abdul–Jabbaar Decl.") ¶ 13; Declaration of John Funmaker in Support of Defs.' Mot. for Summ. J. ("Funmaker Decl.") ¶ 14.

Defendants have tendered evidence that PVSP does not have funding in its current fiscal year to hire paid Wiccan chaplains and that there is presently a hiring freeze throughout the CDCR. Smith Decl. ¶¶ 5, 14' Declaration of A. Bonilla In Support of Defs.' Mot. for Summ. J. ("Bonilla Decl.") ¶ 5.

### 3. Relevant Policies and Practices of CDCR and Its Facilities

#### a. CDCR Policies and Practices

The parties do not dispute that CDCR's regulations provide that the heads of institutions are required to make "every reasonable effort to provide for the religious and spiritual welfare of all interested inmates." Def.'s SUF ¶ 52, citing Cal.Code

Regs. tit. 15 § 3210. Reasonable efforts may include employing chaplains, use of volunteer chaplains, provision of space to conduct services, and modification of inmates' work schedules to attend religious services. *Id.*

According to the CDCR Operations Manual, the Office of Community Resources is charged with religious programming in correctional facilities and oversees religious chaplains. Wang Decl. Ex. 52 (CDCR Operations Manual § 11010.11.2). Chaplains serve on the "Chaplains Coordinating Committee," which advises CDCR on religious policy and programming. *Id.* § 11030.9. They also meet with the Warden of the institution quarterly. *Id.* § 101060.3. They are responsible for organizing and conducting religious services themselves and approving that done by volunteer chaplains. *Id.* § 101060.6.

Chaplains also receive religious items ordered from vendors by inmates prior the items being given to the inmate, which may be subject to the chaplain's approval. *Id.* §§ 54030.7., 54030.10.9. Chaplains are also responsible for approving inmates' requests for items from vendors. *Id.* § 54030.10.9. Chaplains also approve inmates' requests for religious meals and administer the Religious Diet Program. *Id.* §§ 54080.13, 54080.14.

#### b. Policies and Practices at CSP–Sac

At the time that plaintiff was an inmate at CSP–Sac, candles and incense were only allowed to be used in the chapel when a chaplain or spiritual advisor was present. Pinochle cards were the only cards permitted among inmates. Defendants have tendered evidence that the purpose of this restriction was to deter gambling and if an inmate transformed pinochle cards into regular playing cards, the cards were confiscated. suf 116.

As Warden of CSP–Sac, defendant White did not have authority to approve the retention of a Wiccan spiritual advisor

at the state's expense. Approval at the Departmental level was necessary. At the time, CDCR's policy was to provide paid chaplains or spiritual advisors for Muslims, Native Americans, Catholics and Protestants. Defendant Gomez stated that paid chaplains were provided to these faiths because they had enough members to warrant the cost. Def. Gomez's Response to Pl.'s Fourth Interrogatory # 25. Plaintiffs have tendered evidence, however, that in a case brought against CDCR and individual defendants who are not the defendants here, the state defendants indicated in a November 2008 brief that CDCR has never

> actually analyzed or applied ... criteria ... including liturgical needs or numbers of inmates of a particular faith group in determining whether any of the five existing chaplain classifications are warranted, whether a new paid chaplain classification is warranted for pagans or for any other faith group, and/or whether to employ chaplains of any faith group.

Wang Decl. Ex. 58 at 1 n. 2; *see also id.* Ex. 57 at 4.

#### c. Policies and Procedures at PVSP

Paid chaplains are provided at PVSP to Catholics, Protestants, Muslims and Native Americans. A paid Jewish chaplain from Avenal State Prison is used at PVSP to minister to Jewish inmates there. Defendants have tendered some evidence that the decision to restrict paid chaplaincies to only these faiths (or groups of faiths, in the case of Protestants and Native Americans) is based on a consideration of size and religious need of those inmate populations. Smith Decl. ¶¶ 6–7.

### B. Procedural History

Plaintiff sued the defendants in 1993 for violation of his civil rights in relation to his religious practice. The parties settled in November, 1997. The terms of the settle-

ment provided, in part, that plaintiff would have access to the Wiccan Bible and other religious materials, even while housed in a Security Housing Unit or Administrative Segregation, consistent with policies and procedures regulating inmate access to religious articles. SAC ¶¶ 29(a)-(d). Additionally, the settlement agreed to permit a volunteer Wiccan spiritual advisor to conduct Wiccan services. SAC ¶ 29(g). In 2003, plaintiff notified the court that defendants were not honoring the terms of the settlement.

The case was reopened, though plaintiff's prior counsel withdrew from representation. In 2006, plaintiff's substituted counsel also withdrew. Proceeding *pro se,* plaintiff filed an amended complaint on January 30, 2006, which supplemented his February 12, 1997 complaint. Plaintiff, with the assistance of counsel, filed a second amended complaint on June 30, 2008.

Defendants Tilton and Yates moved to dismiss plaintiff's third and sixth causes of action on July 25, 2008. The court denied the motion on September 16, 2008, 2008 WL 4283650. Shortly thereafter, plaintiff filed a Third Amended Complaint, which defendants have answered.

## II. STANDARD FOR MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Summary judgment is appropriate when there exists no genuine issue as to any material fact. Such circumstances entitle the moving party to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 853 (9th Cir.1995). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those por-

tions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Ltd.,* 51 F.3d at 853. In doing so, the opposing party may not rely upon the denials of its pleadings, but must tender evidence of specific facts in the form of affidavits and/or other admissible materials in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *see also First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. 1575. In evaluating the evidence, the court draws all reasonable inferences from the facts before it in favor of the opposing party. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam* )); *County of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir.2001). Nevertheless, it is the opposing party's obligation to produce a factual predicate as a basis for such inferences. *See Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348 (citations omitted).

## III. ANALYSIS

Defendants move for summary judgment on all seven of plaintiff's causes of action. The court considers each in turn. For the reasons explained herein, the motion is granted in part and denied in part.

### A. Religious Land Use and Institutionalized Persons Act

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibits the government from imposing a "substantial burden" on the religious exercise of a person confined to an institution, even if the burden derives from a rule of general applicability, unless the government shows that the burden is the least restrictive means for furtherance of a compelling government interest. 42 U.S.C. § 2000cc–1. "Government" includes a state or entity created under state authority. *Id.* § 2000cc–5(7)(A).

■ Analysis of whether government action is lawful under RLUIPA proceeds in four parts. First, the plaintiff must show that the exercise of his religion is at issue. Religious exercise is defined broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Courts have recognized that the ability to engage in group worship is the type of religious exercise protected under RLUIPA. *See, e.g., Cutter v. Wilkinson,* 544 U.S. 709, 720, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005); *Greene v. Solano County Jail,* 513 F.3d 982, 987 (9th Cir. 2008). Moreover, the Ninth Circuit has indicated that RLUIPA protects the exercise of any sincerely held religious belief. *Shakur v. Schriro,* 514 F.3d 878, 888 (9th Cir.2008). Here, defendants do not dispute that plaintiff's religious beliefs at issue are sincerely held or that his religious

activities at issue are the type protected under RLUIPA. Defs.' Mot. for Summ. J. at 10. The court therefore turns to the next step.

#### 1. Substantial Burden on Plaintiff's Religious Exercise

■ The second stage of the inquiry is whether the state's conduct substantially burdens plaintiff's religious exercise. *See* 42 U.S.C. § 2000cc–1. A substantial burden is one that imposes a "significantly great restriction or onus upon" the identified religious exercise. *San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004). A substantial burden may be one that makes the religious practice more difficult or penalizes the practitioner for engaging in it, *see Warsoldier v. Woodford,* 418 F.3d 989, 995 (9th Cir.2005), or even that withholds a benefit from the practitioner for his religious exercise. *See id.,* citing *Planned Parenthood v. Arizona,* 718 F.2d 938, 942 (9th Cir.1983). For instance, in *Warsoldier,* the Ninth Circuit held that CDCR substantially burdened plaintiff inmate's religious exercise by penalizing him for not cutting his hair, which would have violated his religious beliefs. *Warsoldier,* 418 F.3d at 995. These penalties included confining plaintiff to his cell, loss of his telephone and recreation privileges, and reclassification into a work group that had less opportunity to earn work credits. *Id.* at 995–96. Reversing the district court's denial of a preliminary injunction, the Circuit court held that these penalties constituted a substantial burden as a matter of law, because the grooming policy "intentionally puts significant pressure on inmates such as Warsoldier to abandon their religious beliefs by cutting their hair." *Id.* at 996.

■ Here, plaintiff has met his prima facie burden to show that defendants Cate and Yates [9] significantly burdened his reli-

9. *Plaintiff has pled this cause of action only* *against these* two defendants.

gious exercise. *See Warsoldier*, 418 F.3d at 994–95. First, plaintiff has tendered some evidence that the policies at PVSP surrounding the ordering and receipt of religious items from vendors have inhibited his timely receipt of religious articles, thereby making his religious practice more difficult or circumscribed. Rouser Decl. ¶¶ 47, 57–60, 91, 108.

Second, plaintiff has tendered evidence that policies at PVSP have inhibited group worship by plaintiff and other Wiccans. This includes, for example, restrictions on Wiccans' use of chapel space, failure to announce Wiccan group worship to the general population, and prohibition on Wiccan's use of certain items, such as a fire pit, that are part of group worship. *See* Rouser Decl. ¶¶ 61, 85; Hysell Decl. ¶¶ 14–15. He has also tendered evidence regarding the PVSP policy for use of lockers by religious groups has resulted in plaintiff and other Wiccan's being unable to access their religious items for group worship. Rouser Decl. ¶¶ 49–50; Second Rouser Decl. ¶ 4; Hysell Decl. ¶¶ 9–10. Additionally, plaintiff has tendered evidence identifying approximately 46 instances in which he was unable to attend group worship for the entire scheduled time due to actions by the guards in failing to escort him to the outdoor area on time, requiring him to return to his cell early, or interrupting his worship. Rouser Decl. ¶¶ 84, 86–95; Second Rouser Decl. ¶ 3. The number of such occurrences and their repetition over several years suggests the existence of a policy for which defendants Yates and Cate are responsible. Evidence of any of these policies suffices to meet plaintiff's prima facie burden of production. *See Warsoldier*, 418 F.3d at 994–95; *see also Greene*, 513 F.3d at 987 (prohibiting a prisoner from engaging in group worship due to his status as a "maximum security prisoner" constituted a substantial burden on his religious exercise).

Third, plaintiff has tendered evidence that defendants have substantially burdened plaintiff's religious exercise by failing to retain a paid chaplain for plaintiff and other Wiccans. Plaintiff has tendered evidence that volunteer spiritual advisors at PVSP cannot approve religious order forms, retrieve orders from the mailroom, approve or deny grievances, access prison keys, and ensure inmates are released on time for services, all of which paid chaplains may do. McCollum Decl. ¶¶ 7–12. Plaintiff has declared that he needs a paid chaplain, specifically, to retrieve religious orders, make copies of religious texts, contact entities outside of PVSP to seek donations, and otherwise facilitate his group worship. Rouser Decl. ¶¶ 104–112. Defendants admit that paid chaplains are present at the institution daily or almost daily, whereas volunteer chaplains are there more infrequently. Defs.' Statement of Undisputed Facts ¶ 182. These facts suffice to meet plaintiff's prima facie burden on the issue that PVSP's policy of not hiring a chaplain to attend to plaintiff and other Wiccans has created a burden that is substantial.

■ As defendants observe, RLUIPA contains a safe harbor provision that provides that the government entity may avoid liability under RLUIPA by changing the policy at issue or creating exceptions to it that eliminates the substantial burden on religious exercise. 42 U.S.C. § 2000cc–3(e). Defendants contend that the delay or cancellation of Wiccan services in October 2007 were due to specific, non-recurring circumstances (e.g., lockdown due to a death, guards' weapons training, need for a chaplain to oversee religious services prior to construction of outdoor worship area). Defendants contend that the October 2008 interference with plaintiff's worship service by the guards' playing loud

music will not recur because they were reprimanded by a supervisor.

The court is not aware of any Ninth Circuit case interpreting this safe harbor provision. The only Court of Appeals that appears to have addressed this provision has interpreted it under a mootness analysis. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir.2003), *cert. denied* 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004). This appears consistent with the plain language of § 2000cc–3(e), which relieves a government entity from liability only upon a showing of a change in its policy or practice.

Here, a jury could reasonably find that the defendants have not shown the type of permanent change that would cause the substantial burden of plaintiff's religious exercise not to recur. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (a controversy may be moot where the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated" (internal citations omitted)). For example, defendants contend that plaintiff was not permitted to attend group services on October 1, 2007 because officers were attending weapons training and understaffing prevented inmates from being released to religious programming at this time. Even if that particular weapons training may not recur, a reasonable inference is that there has been no deliberate change in defendants' policies to prevent the substantial burdening of religious group worship when similar events or staffing problems do occur. Similarly, although the defendants have tendered evidence that the guards who played loud music during plaintiff's October 2008

group service were reminded by a supervisor that this was inappropriate, defendants have not shown that that action was sufficient to meet the safe harbor standard of § 2000cc–3(e). Finally, as detailed above, plaintiff has tendered evidence of several policies, including those regarding ordering and receipt of religious articles by vendors and those regarding hiring paid chaplains, for which there is no evidence of a changed policy that would implicate § 2000cc–3(e).[10]

■ Finally, the defendants assert that the failure to hire a paid chaplain to attend to the religious needs of plaintiff and other Wiccans cannot be considered a violations of RLUIPA because RLUIPA does not create affirmative duties on states. This argument has some superficial appeal, as the Ninth Circuit has held, when considering the statute's Constitutionality under the Establishment Clause, RLUIPA "does not impose affirmative duties on states that would require them to facilitate or subsidize the exercise of religion. RLUIPA instead calls for exactly the opposite— forbidding states from imposing impermissible burdens on religious worship . . . ." *Mayweathers v. Newland*, 314 F.3d 1062, 1068–69 (9th Cir.2002); *see also Cutter*, 544 U.S. at 720 n. 8, 125 S.Ct. 2113 (in considering the validity of RLUIPA under the Establishment Clause, observing that "RLUIPA does not require the State to pay for an inmate's devotional accessories"). Defendants argue that if plaintiff's religious exercise has been burdened by lack of a Wiccan priest, that is a result of his incarceration and cannot constitute a violation of RLUIPA.

This argument appears to misunderstand the crux of plaintiff's argument and

---

**10.** Although there is evidence that PVSP enacted a new policy for approval of orders to outside vendors for purchase of religious items, Rouser Decl. ¶ 57; Myers Decl. ¶ 18, plaintiff has tendered some evidence that the new policy has not resolved—and, in fact, has exacerbated—the delays he had previously experienced. Rouser Decl. ¶ 60.

the evidence he has marshaled in support of it. According to plaintiff, PVSP has policies that give paid chaplains certain rights and authority within the institution, which volunteer chaplains (and inmates themselves) are denied. These include, according to plaintiff's evidence, the ability to make copies of religious materials at no cost, the ability to respond to grievances related to religious practice, the ability to move about the facility unescorted, the ability to retrieve religious orders from the mailroom and distribute them, and the ability to ensure inmates are released on time for religious services, among others. McCollum Decl. ¶¶ 8–12; Rouser Decl. ¶¶ 104–112. It appears that plaintiff's argument is that defendants violate RLUIPA by creating a system in which paid chaplains are given these privileges and that plaintiff's ability to engage in religious exercise is hindered by not having a chaplain who has these privileges who is responsible for the religious needs of Wiccans. In other words, although failure to hire a religious minister or priest alone may not violate RLUIPA per *Mayweathers*, it may violate RLUIPA where the institution has created a set of policies whereby a practitioner will be substantially burdened in his religious exercise without a paid chaplain.[11]

Accordingly, defendants have not shown that plaintiff has not met his burden under 42 U.S.C. § 2000cc–2(b) to make a prima facie showing that defendant's actions substantially burdened his religious exercise. The court turns to the next step of the inquiry.

## 2. Compelling Government Interest

■ Even if the plaintiff demonstrates that the state action in question substantially burdened his religious exercise, the

---

11. As defendants acknowledge, hiring of paid chaplains does not alone violate the Establishment Clause. *See, e.g., Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir.1993); *Allen v. Toombs*, 827 F.2d 563, 567 (1987); *Johnson–Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir.1988); *see also* Defs.' Mot. for Summ. J. at 23.

At oral argument, however, defendants raised for the first time *Rasul v. District of Columbia*, 680 F.Supp. 436 (D.D.C.1988), for the proposition that the state cannot hire a religious chaplain to perform purely administrative functions. In that case, a Muslim minister was rejected in his application to be a chaplain at a District of Columbia correctional facility because the facility was seeking a Protestant chaplain. *Rasul*, 680 F.Supp. at 437. The district court held that this violated Title VII because being of a particular denomination was not necessary for the chaplain position, whose duties were to administer the religious programming for the facility as a whole. *Id.* at 440–41. Defendants contend that a similar Title VII concern would be present here, to the extent that plaintiff seeks a Wiccan chaplain to perform merely administrative functions.

The problem with defendants' argument is that it addresses the viability of a particular remedy to plaintiff's claims, if successful, without refuting the violations alleged in his claims. As described herein, several of plaintiff's claims are supported with evidence that defendants have failed to hire a Wiccan chaplain to minister to his spiritual needs directly as well as established a system whereby plaintiff's lack of a paid chaplain indirectly hinders his ability to practice his faith due to the privileges granted to paid chaplains. Plaintiff has not, despite defendants' emphasis on this point, alleged in his complaint that he specifically seeks as a remedy the hiring of a Wiccan chaplain. *See generally* Third Amended Complaint. Instead, he seeks *inter alia* "injunctive relief according to proof." *See id.* The scope of that injunctive relief, if any, must certainly accord with federal law and the extent to which *Rasul* is applicable to this case will be the court's concern at that time. However, that part of the plaintiff's desired remedy may be limited is not a basis for granting defendants' motion, in which defendants have asserted that plaintiff cannot meet his evidentiary burden on the elements of his causes of action and that certain defenses apply. *See generally* Defs.' Mot. for Summ. J. at 8–30. *Rasul* therefore appears irrelevant to the resolution of the instant motion.

state action does not violate RLIUPA if the defendants demonstrate that the action was taken in furtherance of a compelling government interest and was narrowly tailored to that interest. 42 U.S.C. § 2000cc–1. Security and safety at a prison is a compelling government interest. *See, e.g., Cutter*, 544 U.S. at 723, 725 n. 13, 125 S.Ct. 2113; *Greene*, 513 F.3d at 986; *Warsoldier*, 418 F.3d at 999. Moreover, the need to balance those concerns against " 'consideration of costs and limited resources' " may also inform the court's analysis. *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113, quoting S.Rep. No. 103–111 at 10.

█ Here, defendants argue that the compelling state interests informing their policies are "(1) the very limited available resources and (2) the various accommodations necessary to facilitate the religious needs of the thirty to 100 religions found throughout the thirty-three prisons operated by CDCR, and the eleven plus religions holding services at PVSP." Defs.' Mot. for Summ. J. at 14.

The court is aware of no authority—and defendants have directed it to none—that has held that cost is a compelling government interest under RLUIPA when a prison policy or practice was at issue. With a similar factual record in *Shakur*, however, the Ninth Circuit held that the defendant had not shown a compelling government interest. 514 F.3d at 891. There, plaintiff inmate had brought suit against defendants for violation of RLUIPA, as well as his Free Exercise and Equal Protection rights, for failing to provide him with a diet that was consistent with his religious beliefs as a Muslim. *Id.* at 881–82. The prison officials refused, citing costs. *Id.* at 889. Specifically, defendants had tendered the declaration of the state Department of Corrections' Pastoral Administrator, in which he stated that it would cost $1.5 million annually to provide the plaintiff's requested diet to all of the state's Muslim

inmates. *Id.* The district court found that this demonstrated that the defendants' decision was in furtherance of a compelling government interest. *Id.*

The Ninth Circuit reversed. It observed that the declaration was offered by the person at the Department of Corrections responsible for securing religious services and accommodations for inmates, not "an official specializing in food service or procurement." *Id.* Additionally, the declarant did not offer any description of the financial analysis on which he relied in reaching his conclusion, nor was such an analysis itself tendered as evidence. *Id.* at 889–90. Because of its conclusory, unfounded nature, the court was "troubled by the district court's reliance on this affidavit." *Id.* at 890. It, without more, could not be the basis for a court to conclude that a reasonable jury would be required to believe that the government's policy was in furtherance of a compelling government interest. *Id.*, citing 11–56 Moore's Federal Practice—Civil § 56.13.

The court is compelled to the same conclusion here. The defendants argue that the cost of accommodating plaintiff's various requests would be prohibitive, particularly when accounting for the religious needs of other inmates throughout CDCR and PVSP. To support this argument they have tendered three declarations. The first is the declaration of the CDCR Community Resources Manager, who declared that there are "perhaps as many as 100 inmate religious faith groups currently practicing within CDCR" and that "[c]ost and practical constraints ... prevent CDCR from employing chaplains of every religious denomination." Smith Decl. ¶ 5. He further declared that, "If any minority religion received a staff chaplain, then all the other minority religions would be expected to demand one. That would require the CDCR to hire hundreds more

chaplains across 33 prisons. CDCR does not have the budgetary resources to pay for chaplains of other faiths." *Id.* The Community Partnerships Manager at PVSP similarly declared that if a Wiccan chaplain was hired, inmates of other religions would also demand chaplains and "this is financially unfeasible." Myers Decl. ¶ 26.[12]

As in *Shakur*, the declarants' descriptions of the feasibility and costs of employing a chaplain to minister to Wiccans appears entirely speculative and without evidentiary support. Furthermore, as in *Shakur*, it is not apparent how the declarants, whose respective roles at CDCR and PVSP are the provision of religious accommodations to inmates, would have personal knowledge of CDCR's financial resources. These declarations, therefore, are minimal, if any, evidence of the defendants' compelling state interest in failing to hire a chaplain for plaintiff's religion.

Defendants have tendered an additional declaration of A. Bonilla, a Correctional Business Manager II at PVSP, to show the prohibitive costs of hiring a chaplain. Among Mr. Bonilla's duties is management of PVSP's budget. Bonilla Decl. ¶ 1. He declared that PVSP has no funds to hire an additional chaplain at the prison and, in fact, that PVSP expects to have a $16–20 million deficit in the current fiscal year. *Id.* ¶¶ 2–3. Furthermore, as of January 2009, there is a hiring freeze at CDCR. *Id.* ¶ 5, Ex. 1.

While this is evidence of the present budgetary constraints on defendants, it falls short of establishing that there is no genuine issue of material fact as to whether the policies and practices of which plaintiff complains served a compelling state interest. First, the Bonilla declaration only addresses the current financial condition of CDCR and PVSP, whereas plaintiff has tendered evidence that the alleged burdens placed on his religious exercise at PVSP have dated back to 2007. *See generally* Rouser Decl. Second, plaintiff has tendered evidence of several policies and practices of defendants that substantially burdened his religious exercise. These include, for example, practices affecting his ability to participate in group worship, obtain religious articles, and access religious articles kept in a locker. Defendants' evidence describing the cost of hiring a chaplain do not relate at all to these alleged burdens. Finally, as the court described above, plaintiff has tendered evidence that a paid chaplain is purportedly necessary not only as a source of spiritual guidance, but also because PVSP has a policy or practice of allowing certain privileges to paid chaplains that volunteer chaplains and inmates do not have, and that those privileges serve to facilitate inmates' religious worship. In other words, while a jury may credit that cost prevents defendants from hiring additional chaplains, it need not credit the notion that cost bears on the defendants' decision to give paid chaplains rights within PVSP that others do not have.

Accordingly, the court cannot agree that, as a matter of law, defendants have met their evidentiary burden under 42 U.S.C. § 2000cc–1 on this element.

### 3. Least Restrictive Means

■ Were a jury to find that defendants' policies or practices furthered a compelling state interest, defendants would nevertheless be liable under RLUIPA unless they demonstrated that the policies and practices were the least restrictive means of furthering that interest. 42

---

**12.** While the assertion is speculative, the fact that there are five paid chaplains does not appear to have caused a flood of demands.

U.S.C. § 2000cc–1. In order to meet this burden, the defendants must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier,* 418 F.3d at 999 (citations omitted). Insistence that the court defer to prison officials' judgment cannot suffice. *Id.* at 1001.

Here, defendants have apparently conceded this point, as they do not offer any argument or evidence on it as part of their motion. Accordingly, defendants' motion for summary judgment on this cause of action must be denied.

## B. Free Exercise

In his second and fifth causes of action, plaintiff alleges that all of the defendants violated his right to free exercise, in violation of the United States and California Constitutions, respectively. Because the right to free exercise under the California constitution is no broader than that under the federal Constitution, the court applies the same analysis to both claims. *See Thompson v. Dep't. of Corr.,* 25 Cal.4th 117, 135 n. 6, 105 Cal.Rptr.2d 46, 18 P.3d 1198 (2001); *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964); *see also Vernon v. City of Los Angeles,* 27 F.3d 1385, 1392 (9th Cir.1994).

■ A prison inmate retains his right to freely exercise his religion, although that freedom may be limited by the countervailing objectives of the institution and by the loss of freedom intrinsic to incarceration. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Therefore, when a prison regulation inhibits an inmate's rights under the free exercise clause, the regulation is valid so long as it is reasonably related to a legitimate penalogical interest. *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). To determine whether a regulation is reason-ably related to that interest, the court considers (1) whether there is a "valid, rational connection" between the regulation and the justification put forth for it and whether that justification is "legitimate and neutral," (2) whether there are alternative means for the inmates' exercise of the right at issue, (3) the impact of the desired accommodation on guards, other inmates, and prison resources generally, and (4) if ready alternatives are absent, although the regulation need not be the least restrictive alternative. *Id.* at 90, 107 S.Ct. 2254. An inmate need not show that the regulation impinges on a central tenet of his faith; he need only show that it impedes the exercise of a sincerely held religious belief. *Shakur,* 514 F.3d at 885.

### 1. Defendants Gomez and White

### a. Threshold Inquiry: Whether Defendants Inhibited Plaintiff's Free Exercise

Defendants first argue that plaintiff cannot succeed on his free exercise claims because there is no evidence from which a reasonable jury could conclude that they impinged on his rights under the federal and state Constitutions. The court disagrees.

■ First, defendants Gomez and White argue that there is no evidence that they directly participated in any denial of plaintiff's access to religious articles at CSP–Sac, and therefore that they cannot be liable. Plaintiff argues that defendants White and Gomez were responsible for his denial of Tarot cards, candles, incense, and access to the chapel, for which he filed a grievance in 1992. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 26. The grievance was denied on the grounds that only pinochle cards were allowed at the prison, to prevent gambling and that candles and incense could not be possessed by inmates for safety concerns. This denial was ap-

proved by the chief deputy warden, who signed the form over defendant White's typewritten name. Defendant White has tendered evidence that he had "no personal knowledge of the grievance, did not discuss it with any of the staff whose names are on the grievance form, did not personally participate in its denial, and did not learn of it" until after the filing of the instant suit. Def. White's Response to Pl.'s First Special Interrogatory # 6. The denial was approved at the Director's level by the Chief of Inmate Appeals, to whom defendant Gomez had delegated disposition of Director's level inmate appeals. Gomez Decl. ¶ 4.

Plaintiff also argues that defendants Gomez and White were responsible for his being denied a Witches Bible while in administrative segregation in 1993. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 26. Plaintiff's grievance was denied on the grounds that the book was "an Occult book on Witches, and therefore is not considered a recognized religion." White Decl. ¶ 4, Attachment 1. The denial was upheld when appealed to the second level. This response was signed and had a signature line for "Theo White, Warden" although defendants contend this was not White's signature. As the court observed above, defendants have not tendered any evidence to substantiate this. That denial was reconsidered and plaintiff was given his Witches Bible in November 1994.

From the evidence tendered, a reasonable jury could find that defendants Gomez and White impinged on plaintiff's ability to freely exercise his religion. As stated above, defendants do not dispute that plaintiff's religious beliefs are sincerely held. Defendants also do not dispute that Tarot cards are items used by Wiccans in religious practice nor that group practice is a part of the Wiccan faith. Plaintiff has also tendered evidence that candles, incense, and a Witches Bible are also impor-

tant for Wiccan religious practice. Rouser Decl. ¶¶ 6, 18. By failing to have access to each of these things, a reasonable jury could find that prison officials made plaintiff's religious exercise significantly more difficult, constituting a substantial burden. *See Warsoldier,* 418 F.3d at 995.

There is also evidence from which a jury could reasonably conclude that defendants Gomez and White were involved in the denial of plaintiff's access to candles, incense, a chapel, and Tarot cards. There is evidence that defendant White was responsible for denial of the grievance regarding these items. Although the denial was signed by the chief deputy warden, the fact that it was signed above defendant White's printed signature line could lead a jury to reasonably infer that the chief warden was acting under White's direction or otherwise with his authority. The same principle is the basis for defendant Gomez's liability with regards to the 1992 grievance, as it is undisputed that he delegated his authority to resolve inmate grievances at the Director's level to the Chief of Inmate Appeals, who denied plaintiff's appeal.

█ There is also evidence from which a jury could reasonably find that defendant White was responsible for the denial of plaintiff's 1993 grievance regarding access to his Witches Bible. Defendants have tendered no evidence to support the argument that the signature on the denial was not White's signature. Even if the jury did believe that someone else signed the form, as with the 1992 grievance, the fact that the signature is above the printed signature line for "Theo White, Warden," indicates that it would not be unreasonable for a jury to infer that the person who signed the form did so under defendant White's authority.

There is no evidence, however, of defendant Gomez's involvement with the 1993

grievance. Although defendant Gomez was responsible for resolution of inmate grievances at the Director's level, the undisputed evidence is that this grievance was resolved before that level was reached. Plaintiff also argues that defendant Gomez was responsible for setting a policy at CSP–Sac of only allowing certain inmates to have religious texts while in administrative segregation. However, plaintiff has not tendered evidence that tends to show the existence of such a policy. Plaintiff's grievance was denied at the first level because the Witches Bible was not a text from a "recognized religion" and was denied at the second level because the book purportedly recommended human and animal sacrifice, the practice of which was not allowed at CSP–Sac. White Decl. ¶ 4, Attachment 1. This discrepancy between the reasons for prohibiting plaintiff's access to the book suggests that there was not a single policy underlying the denial, but that the denying officers developing their own reasons for denying the grievance. Moreover, even if such a policy did exist, there is no evidence tendered that it was created, promulgated, or approved by defendant Gomez.[13] Gomez therefore cannot be liable on plaintiff's second and fifth causes of action on the basis of plaintiff's 1993 grievance regarding access to his Witches Bible while in administrative segregation.

**b. Whether There Was a Rational Connection Between the Regulation and a Legitimate, Neutral Justification**

■ When weighing whether a regulation that impinges on the constitutional rights of inmates is valid, the court considers several factors. *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (internal citations omitted). Important to this inquiry is whether the restriction operates in a neutral fashion, regardless of the nature of the inmate's First Amendment expression. *Id.* at 90, 107 S.Ct. 2254.

With regards to defendants White and Gomez's participation in denying plaintiff's 1992 and 1993 grievances, they have offered no justification for the denial of his access to a chapel. This factor, therefore, weighs strongly towards finding that the denial violated the plaintiff's free exercise rights.

■ In denying plaintiff access to Tarot cards and the Witches Bible, prison officials offered ostensibly legitimate, neutral justifications. They asserted that these items were denied because they, respectively, may have threatened the safety of the prison by facilitating gambling and encouraged violent practices that were prohibited in the prison. *See* Gomez Decl. Attachment 1; White Decl. ¶ 4, Attachment 1. Nevertheless, the inquiry into the validity of these justifications requires consideration of whether they are imposed in a neutral fashion. *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. Here, there is evidence from which a jury could conclude that they are not. *See Henderson v. Terhune,* 379 F.3d 709, 712 (9th Cir.2004) (question of whether government interest is legitimate is question of fact). It is undisputed that CSP–Sac permitted inmates to have pinochle cards, which could likely be altered

---

**13.** Although plaintiff argues that under the California Penal Code and Regulations, defendants are liable because they have a general duty to protect the rights of inmates, including their rights of religious freedom. This duty alone cannot form the basis of the defendants' § 1983 liability, which requires evidence of a defendant's direct and personal involvement in the deprivation. *See, e.g., Rizzo v. Goode,* 423 U.S. 362, 376–76, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

to be used for gambling as easily as Tarot cards. Similarly, it is undisputed that the Christian Bible contains references to human and animal sacrifice, but inmates were nevertheless permitted these texts in administrative segregation. *See* Rouser Decl. ¶ 26; Wang Decl. Ex. 61. Because a jury could reasonably find that these inconsistencies suggest a lack of neutrality in the justification offered by defendants, this factor is at best neutral for defendants with regards to the denial of the Tarot cards and Witches Bible.

▇▇▇ Finally, prison officials denied plaintiff access to incense and candles on the basis that they raised fire safety concerns. Gomez Decl. Attachment 1. Safety and security within a prison "clearly meet" the *Turner* requirement of a legitimate justification for a prison regulation. *O'Lone*, 482 U.S. at 350, 107 S.Ct. 2400. Denying inmates access to candles and incense appears rationally related to this interest and there has been no evidence tendered that this regulation was not enforced in a neutral manner. Therefore, this factor weighs in favor of finding the denial of incense and candles proper under *Turner*.

### c. Remaining *Turner* Factors

▇▇▇ Under *Turner*, the court must also consider whether there are alternative means for the inmate's exercise of the constitutional right at issue, the impact of the desired accommodation on guards, other inmates, and prison resources generally, and the absence of other alternatives. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. Defendants Gomez and White have not addressed these factors in their briefing nor offered evidence on these factors. *See* Defs.' Mot. for Summ. J. at 21–22. Defendant White's motion on these causes of action, therefore, must be denied. Defendant Gomez's motion is denied, except as to plaintiff's second and fifth causes of

action to the extent that they allege violations deriving from plaintiff's April 1993 grievance.

### 2. Defendants Cate and Yates

The court described the evidence of defendants Cate's and Yates' alleged violations of plaintiff's free exercise rights in section III.A., *supra*. Except as to the issue of the lack of a paid Wiccan chaplain, defendants Cate and Yates appear to argue that summary judgment should be granted in their favor on plaintiff's second and fifth causes of action because the policies and practices at issue did not constitute substantial burdens on plaintiff's religious practice. *See* Defs.' Mot. for Summ. J. at 16–21. The court disagrees. As described above, plaintiff has tendered evidence from which a jury could reasonably find that the defendants' policies and practices substantially burdened his religious exercise. Accordingly, defendants Cate's and Yates' motion is denied as to plaintiff's second and fifth causes of action, insofar as they allege the defendants impeded his access to religious items from outside vendors, to group worship services, and to religious items used for group worship.

Defendants argue that consideration of the *Turner* factors warrants the grant of summary judgment in their favor on the question of their failure to provide a paid chaplain for Wiccans. The court turns to that question now.

### a. Whether There Was a Rational Connection Between the Regulation and a Legitimate, Neutral Justification

▇▇▇ Defendants first encourage the court to adopt the rule that failure to provide a chaplain can never constitute a free exercise violation, relying on *Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir.1993) and *Allen v. Toombs*, 827 F.2d 563, 567

(1987).[14] Neither of those cases stand for so broad a rule. In *Ward*, 1 F.3d at 880, the court concluded that a prison did not have an affirmative duty to "provide each inmate with the spiritual counselor of his choice." There, however, it appeared that plaintiff's only purpose for desiring a rabbi was to attend to his spiritual needs; there is no indication that clergy or chaplains in the prison in that case had any of the same administrative privileges as plaintiff has alleged here. *See id.* In *Allen*, 827 F.2d at 567, the court held that failure to provide an outside spiritual counselor to Native American inmates did not violate the Equal Protection Clause because it provided Native Americans a reasonable opportunity to exercise their faith, in compliance with the standard set forth in *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Thus, neither *Ward* nor *Allen* stand for the rule that under no set of facts could an inmate plaintiff succeed on a free exercise claim on the basis of prison officials' refusal to provide a paid chaplain. Therefore the court turns to the first *Turner* factor.

Under the first *Turner* factor, the court must consider whether there was a legitimate, neutral penalogical interest that was rationally related to the disputed regulation. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254; *Shakur*, 514 F.3d at 885–86. Administrative and budget concerns are legitimate interests. *Shakur*, 514 F.3d at 886. As described above, in *Shakur* the court had before it only minimal evidence of the cost concerns justifying the prison's decision not to provide certain religious meals to the plaintiff. *Id.* Specifically, the defendants had only tendered the apparently unfounded and conclusory declaration of one prison official describing the costs of accommodating all the inmates of plaintiff's faith. *Id.* Although this did not suffice to show a compelling government interest under RLUIPA, it was sufficient under the Free Exercise analysis for the court to hold that it "cannot conclude that no rational nexus exists between ADOC's dietary policies and its legitimate administrative and budgetary concerns. ADOC could rationally conclude that denying Muslim prisoners kosher meals would simplify its food service and reduce expenditures." *Id.* Consequently, this factor weighed "slightly in favor of" the defendants. *Id.*

Similarly, the defendants have tendered evidence that causes this factor to weigh in their favor. The cost of employing a paid chaplain for Wiccans is a legitimate interest. *See id.* While there remains no evidence describing the financial state of CDCR or PVSP in previous years, the defendants have tendered evidence that in

---

14. Defendants also rely on several out of circuit cases that are not particularly persuasive. In *Gittlemacker v. Prasse*, 428 F.2d 1, 4–5 (3rd Cir.1970), the court held that there was an absence of evidence on record to establish that plaintiff's free exercise of religion was burdened. Also, that case was decided long before *Turner* and does not engage in the type of analysis described by the *Turner* Court. In *Blair–Bey v. Nix*, 963 F.2d 162, 163 (8th Cir. 1992), the court held that there was insufficient evidence that the prison's current chaplains were inadequate for the plaintiff's religious needs, and so plaintiff had not shown that his religious exercise had been substantially burdened. In *Johnson–Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir.1988), the issue before the court was not whether a prison would be required to employ a chaplain for plaintiff, but the propriety of certain restrictions on inmate-conducted services and on religious volunteers and alleged delays in plaintiff's religious accommodations. To the extent that the court did address, in dicta, the free exercise implications of hiring chaplains, it explained, "Prisons are entitled to employ chaplains and need not employ chaplains of each and every faith to which prisoners might happen to subscribe, but may not discriminate against minority faiths except to the extent required by the exigencies of prison administration." *Id.* at 1312.

the current fiscal year, there is no funding for additional staff at PVSP and there is a hiring freeze in place. CITE. This, as in *Shakur*, leads the court to conclude that there is at least some evidence of a rational nexus between the stated budget concerns and defendants' failure to hire a chaplain for Wiccan inmates.

### b. Whether There Are Alternative Means For the Inmates' Exercise of the Right at Issue

■■■ Next, the court considers whether there are alternative means for the plaintiff to exercise his asserted right. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. Here, plaintiff alleged in his Third Amended Complaint that a chaplain is useful as a source of spiritual guidance. TAC ¶ 33; *see also* Rouser Decl. ¶ 103 (stating that a volunteer or paid chaplain would be useful to "service our needs."). He also alleged and has tendered evidence that paid chaplains facilitate many other aspects of inmates' ability to worship due to the policies in place at PVSP, as discussed above. While defendants may be correct in asserting that a volunteer or inmate clergymember may provide the same type of spiritual guidance as a paid chaplain, defendants have not addressed the plaintiff's other asserted burdens as a result of lacking a paid chaplain. As described above, plaintiff's evidence indicates that the lack of a chaplain has impeded his ability to consistently and fully engage in group practice. As the Ninth Circuit has acknowledged, an inmate's inability to participate in religious services and "congregate with other practitioners of his faith for prayer and discussion" has no adequate substitute. *Ward*, 1 F.3d at 878. If the opportunity to pray privately were considered an adequate alternative to group practice, "the [second *Turner*] factor would have no meaning at all." *Id.*

As such, this factor weighs against defendants based on the evidence tendered to the court.

### c. The Impact of the Desired Accommodation on Guards, Other Inmates, and Prison Resources Generally

■■■ Next, the court considers whether provision of a paid chaplain for Wiccans would adversely impact others in the prison or the allocation of prison resources generally. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. The *Turner* Court explained this factor as "[w]hen the accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officers." *Id.* For example, inmates' association rights may be curtailed to the extent that they may threaten the security of the institution. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132–33, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Where the institution claims a financial or administrative burden by accommodating plaintiff's request, there must be specific evidence supporting that assertion. *Shakur*, 514 F.3d at 886–87; *Ward*, 1 F.3d at 878–79.

■■■ Defendants' only argument on this element is a reiteration of their argument on the first factor, that the cost of hiring a Wiccan chaplain is too onerous, in part because it will lead to hiring of chaplains for all religious groups at PVSP. Defs.' Mot. for Summ. J. at 20. As in *Shakur* and *Ward*, defendants have offered the latter assertion with no factual support. As those cases demonstrate, prison officials' conjecture as to the burdens of a proposed accommodate do not suffice to meet the third *Turner* factor. *See Shakur*, 514 F.3d at 886–87; *Ward*, 1 F.3d at 878–79. Aside from evidence of the current fiscal year's budget and hiring freeze

at CDCR and PVSP, defendants have tendered no evidence to support their "slippery slope" argument nor any evidence of the cost of hiring a chaplain for Wiccan inmates. They also have tendered no evidence as to the effect that hiring would have on prison administration or PVSP's or CDCR's budget for other programs or expenses. Defendants therefore have not shown that the third *Turner* factor weighs in their favor.

#### d. The Existence of Ready Alternatives

■ Finally, the court considers whether there are ready alternatives to the accommodation plaintiff seeks. *Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90, 107 S.Ct. 2254. The cost and availability of alternatives are relevant. *Shakur,* 514 F.3d at 887. Like the other factors, the prison officials may not rest on bare assertions, but must tender evidence with which a court may analyze this factor. *Ward,* 1 F.3d at 879.

■ Here, defendants assert, "There is no easy alternative to relying on the current multi-prong policy in place at the CDCR, which attempts to reasonably accommodate religious needs by various religious groups as they arise under the particular circumstances at each prison." Defs.' Mot. for Summ. J. at 20. They offer no evidence to substantiate this nor analysis of possible alternatives to the failure to hire a chaplain for Wiccans. This is particularly unpersuasive, as evidence tendered by plaintiffs suggests that there may exist adequate alternatives to hiring a chaplain for Wiccans at PVSP, such as altering PVSP policies so that volunteer chaplains have the same administrative privileges as paid chaplains or hiring a

chaplain for all Pagan faiths, as plaintiffs' suggest, or hiring a chaplain whose time is divided among institutions, as apparently is done with a Jewish chaplain at PVSP and Avenal State Prison. Myers Decl. ¶ 25. Defendants have tendered no evidence that they have considered these alternatives or others nor whether they would effectively address their administrative and financial concerns that they assert prevent them from hiring a chaplain for Wiccan inmates at PVSP. Additionally, as CDCR apparently admitted in another case only a few months ago, CDCR has not based its decision to hire or not hire chaplains of certain faiths on an assessment of inmates' liturgical needs. *See* Wang Decl. Ex. 58 at 1 n. 2; *see also* Wang Decl. Ex. 57 at 4. Accordingly, based on the evidence tendered, the fourth *Turner* factor does not favor defendants.

Considering all *Turner* factors together, the court concludes that defendants have not shown that as a matter of law they have not violated plaintiffs' free exercise rights. Defendants' motion is therefore denied as to plaintiffs' second and fifth causes of action.

#### C. Establishment Clause

In his third and sixth causes of action, plaintiff alleges defendants violated the Establishment Clause of the First Amendment of the federal Constitution and of Article I, section 4 of the California Constitution, respectively. The Establishment Clause analysis under the California Constitution is the same as that of its federal counterpart. *East Bay Asian Local Development Corp. v. State of California,* 24 Cal.4th 693, 718, 102 Cal.Rptr.2d 280, 13 P.3d 1122 (2000).

In his Third Amended Complaint, plaintiff alleged that defendants violated the Establishment Clause of the federal and state constitutions by harassing him on the

basis of his faith, denying him access to religious articles, denying him access to group worship, and denying him access to a spiritual leader, all of which he alleged was not done to inmates of other faiths. TAC ¶¶ 59, 76. In his opposition to defendants' motion, he specifies that defendants have made it more difficult for Wiccans to access their group religious items than those used by members of other faiths; that defendants have inhibited Wiccans' group worship in a manner that is not done for other religions, which includes disparate policies regarding paid chaplains and failing to make announcements about Wiccan religious services; and that Wiccans, unlike Native American inmates, cannot access a sweat lodge or fire pit for religious purposes.[15]

■■■ In the September 16, 2008 order, the court discussed the appropriate approach to an Establishment Clause claim in the context of an incarcerated plaintiff. It concluded that the rule set forth in *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), requiring strict scrutiny when a government entity demonstrates a preference for a particular religion, applies in a prison context. When an institution provides religious accommodations to inmates, it must do so in a neutral manner. *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994); *Larson*, 456 U.S. at 244, 102 S.Ct. 1673.

Defendants encourage the court to adopt the alternative rule that "the test in the prison context ... should be: whether, after considering practical alternatives,

employing chaplains is reasonably necessary to accommodate prisoner free exercise rights by providing prisoners with a reasonable opportunity to practice their religion." Defs.' Mot. for Summ. J. at 24. As support for this approach, they cite *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam), *Katcoff v. Marsh*, 755 F.2d 223, 235 (2d Cir.1985), and *Duffy v. State Personnel Bd.*, 232 Cal.App.3d 1, 12–13, 283 Cal.Rptr. 622 (1991). None of these cases aid defendants' contention.[16]

The *Cruz* Court did not address the Establishment Clause, but rather Free Exercise and Equal Protection claims under the First and Fourteenth Amendments, respectively. 405 U.S. at 321–22, 92 S.Ct. 1079. The Ninth Circuit has acknowledged this, relying on *Cruz*'s holding in the context of an Equal Protection analysis. *See Shakur*, 514 F.3d at 891. Other Circuits understand *Cruz* similarly. *Thompson v. Commonwealth of Kentucky*, 712 F.2d 1078, 1080 (6th Cir.1983); *Saleem v. Evans*, 866 F.2d 1313, 1317–18 (11th Cir.1989). *Cruz*, therefore, is minimally, if at all, instructive in crafting an Establishment Clause rule to apply in the prison context and certainly neither expressly nor implicitly overruled the Establishment Clause jurisprudence on which the *Larson* Court relied. *See Larson*, 456 U.S. at 244–46, 102 S.Ct. 1673.

*Katcoff* similarly does not compel divergence from the *Larson* test. There the Second Circuit considered whether military chaplaincies violated the Establishment Clause. *Katcoff*, 755 F.2d 223. The

---

**15.** Plaintiff does not argue in his opposition to defendant's motion that his having been prohibited from possessing a Witches Bible in Ad–Seg in 1993 constituted a violation of the Establishment Clause.

**16.** Moreover, defendants have not demonstrated that under the law of the case, there

are circumstances that warrant the court's reconsideration of an earlier ruling on this issue. *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997) (citing *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir.), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 661 (1993)).

court held that the *Lemon* test, which applies where a statute pertains to religion but is facially neutral among religions, is not applicable in the military context. *Id.* at 232–34. Instead, the court should consider the chaplaincy rules in light of the War Powers clause and, as such, "the test of permissibility in this context is whether, after considering practical alternatives, the chaplaincy program is relevant to and reasonably necessary for the Army's conduct of our national defense." *Id.* at 235. The court held that the military's chaplaincy program met this standard. *Id.* at 238.

Again, this case is not particularly instructive in resolution of the instant case. As the court described in its previous order, the issue plaintiff raises is not whether prison chaplaincies violate the Establishment Clause, but whether it is violated when the prison provides paid chaplains for only a small handful of religions. Order, Sept. 16, 2008 at 12–16. As *Larson* described, the distinguishing among religions implicates the Establishment Clause in a manner that requires strict scrutiny. Moreover, the *Katcoff* court's analysis relied heavily on the primary importance of the military for our nation, as acknowledged in the text of the Constitution, and particularly the historical deference given to the military's decisions in maintaining a chaplaincy program. *See Katcoff,* 755 F.2d at 232–33. Defendants have not made any showing that similar deference to state prison officials is appropriate.

Finally, *Duffy,* 232 Cal.App.3d 1, 283 Cal.Rptr. 622, does not compel the court to adopt defendants' proposed test in lieu of the *Larson* rule. There, the court considered whether *Lemon* barred the state Department of Corrections from requiring Roman Catholic clergy to meet certain qualifications (e.g., being ordained and in good standing in their church) before acting as a prison chaplain. *Duffy,* 232 Cal. App.3d at 12–13, 283 Cal.Rptr. 622. The

court held that this rule did not represent entanglement in religion under the Establishment Clause because the department deferred to the church's decision as to whether the clergymember was qualified. *Id.* at 17–19, 283 Cal.Rptr. 622. Justice Blease, in his concurrence, emphasized, "[t]he state may not discriminate among religions in the payment of chaplains as, for example, by choosing to pay chaplains only from established denominations." *Id.* at 23, 283 Cal.Rptr. 622. As the court explained in its September 16, 2008 order, *Duffy* does not indicate that *Larson* should not apply where, as is alleged here, defendants appear to operate a policy of preference of certain religions over others.

■ In short, the court adheres to the approach it has previously concluded was mandated in the factual circumstances alleged here. Under *Larson,* when a plaintiff shows that a law or other state action grants a denominational preference among religions, the court must "treat the law as suspect and … apply strict scrutiny in adjudging its constitutionality." *Larson,* 456 U.S. at 246, 102 S.Ct. 1673. As the court explained in its previous order, the notion that this test applies even in the prison context was supported by the Supreme Court's reliance on this principle when determining that RLUIPA is not in conflict with the Establishment Clause. *See Cutter v. Wilkinson,* 544 U.S. 709, 720–24, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

The court considers each element of this test in turn.

### 1. Denominational Preference

■ Preliminarily, the *Larson* test only applies where plaintiff has shown that the state law or action manifests a preference to some religions over others. *Larson,* 456 U.S. at 246, 102 S.Ct. 1673. Plaintiff has made this prima facie showing

with regards to certain of defendants' policies. First, in resolving the motion to dismiss, the court took judicial notice of CDCR's Departmental Operations Manual, which allows wardens to hire chaplains of "Muslim, Jewish, Catholic, Protestant ... and Native American" faiths. Order, Sept. 16, 2008 at 16. Defendants do not dispute that this is the policy for paid chaplains at PVSP. *See* Declaration of Carol Ong in Support for Mot. for Summ. J. ("Ong Decl.") ¶ 4. As the court held previously, this demonstrates a facial denominational preference regarding the policy for paid chaplains. Order, Sept. 16, 2008 at 16.

Second, plaintiff has tendered evidence that Native American inmates are allowed access to a sweat lodge and fire pit, while Wiccan inmates are not. Rouser Decl. ¶ 61; Barnhardt Decl. ¶ 4. Defendants appear not to dispute this. *See* Defendants' Objections to Plaintiff's Evidence in Support of Plaintiff's Opposition to Motion for Summary Judgment.

Third, plaintiff has tendered evidence that at present the locker containing Wiccan items is secured with a keyed lock, the lockers for the Native American and Catholic items is secured with a combination lock, and the locker containing items for Protestant inmates has no lock. Hysell Decl. ¶ 7; Second Rouser Decl. ¶ 4; Irvin Decl. ¶ 17; Vann Decl. ¶ 3. Plaintiff has tendered evidence that the Native American and Catholic inmate clerks know the combination to their locks, so they may access their items without staff assistance. Hysell Decl. ¶ 8. Although defendants have tendered evidence that this is no longer the policy, Myers Decl. ¶ 13; Huckabay Decl. ¶ 16, which plaintiff disputes, a jury could reasonably find that PVSP's locker policy evinces a current or past denominational preference.

Fourth, plaintiff has tendered evidence that PVSP staff makes announcements to the general population about Protestant, Catholic and Muslim services, but rarely announce Wiccan services. Hysell Decl. ¶¶ 14–15; Powell Decl. ¶ 7. Defendants dispute this and have tendered evidence that officers will announce various religious services depending on whether the officer is busy or not. Huckabay Decl. ¶ 5. This evidence leads to a reasonable inference that there is a policy at PVSP of denominational preference with regards to announcements of religious services and also suffices to show that plaintiff has met his burden to make a prima facie showing of denominational preference. Were a jury to credit defendants' evidence, the announcement policy is facially neutral and therefore is analyzed under the analysis of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which the court undertakes in section III.C.4, *infra*.

### 2. Compelling Government Interest

■ Under the strict scrutiny rule employed in *Larson*, in order to be granted summary judgment on their motion, defendants must show that no reasonable jury could find that their policy of denominational preference in paid chaplaincies is closely related to furthering a compelling government interest. *Larson*, 456 U.S. at 246–47, 102 S.Ct. 1673.

Defendants' only argument and evidence tendered on their justification for their policies implicating the Establishment Clause relates to the policy regarding hiring of chaplains. Therefore, the court concludes that defendants have not shown that as a matter of law plaintiff's third and sixth causes of action must fail to the extent that they are based on defendants' policies regarding the sweat lodge and fire pit, access to lockers for religious items, and announcements regarding religious services (assuming that a jury found that

the announcement policy was not facially neutral among religions).

With regards to the hiring of a chaplain for Wiccan inmates, defendants assert that their current policy is driven by the needs of the inmate population as a whole. According to defendants, "[i]f CDCR determines that an inmate faith group is numerous across CDCR's prisons and has liturgical needs that cannot be met by relying on volunteer or inmate-led services, CDCR will determine whether providing a staff chaplain is reasonably necessary to accommodate those inmates' needs." Defs.' Reply in Support of Mot. for Summ. J. at 10, citing Smith Decl. ¶¶ 7–10, 24–25. This seems to imply defendants' previous cost argument as well, because the underlying premise appears to be that defendants cannot afford to provide staff chaplains to inmates of every faith, so CDCR makes a determination based on a religious group's need for a chaplain.[17] *See* Smith Decl. ¶¶ 4–6, 9.

As described in section III.A, *supra*, defendants have not tendered evidence that provision of a staff chaplain for Wiccan inmates is unduly costly and has been in previous relevant fiscal years, such that a finding in their favor is required as a matter of law. In the strict scrutiny analysis, a state interest must be shown with evidentiary support to be compelling before a court may conclude that this element of the test has been met. *See, e.g., City of Richmond v. Croson*, 488 U.S. 469, 501–502, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (in the context of racial classifications subject to strict scrutiny "simple legislative assurances of good intention cannot suffice" to show a compelling state

interest, but rather must be based on evidence); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276–77, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion) (same). Defendants' motion is therefore denied as to this element.

### 3. Closely Fitted to the State Interest

█ Under *Larson*, a regulation that manifests a denominational preference must be "closely fitted" to the state's compelling interest. *Larson*, 456 U.S. at 246–47, 102 S.Ct. 1673. To make this showing, the state must produce facts to substantiate their assertions. *Id.* at 248–51, 102 S.Ct. 1673 (finding this prong was not met where the state had tendered no evidence to support it).

█ Here, defendants contend that the CDCR policy of providing paid chaplains for five specified religious groups is based on several considerations. Smith Decl. ¶ 6. First, adherents of those faiths need a chaplain to practice their faith and volunteer chaplains are inadequate in this regard, which CDCR refers to as "liturgical need." *Id.* Second, these five groups are "the largest or at least significant" among the CDCR inmate population. *Id.* Third, the decision is informed by the "level of demand for religious services conducted by a chaplain of their faith." *Id.* ¶ 7. Fourth, CDCR considered "existing and alternative accommodation means," as well as budgetary restraints, security, and "other practical factors." *Id.* Of these, liturgical need, the size of the relevant religious practitioners across CDCR, and the adequacy of volunteer chaplains and other accommodations are the most significant

---

**17.** Defendants have also tendered evidence, although do not rely on it in their motion or reply, that CDCR's decision to hire chaplains for five specified faiths was made to prevent "a denominational imbalance when layoffs occurred, as chaplains were laid off or re-

tained based on seniority rather than faith group." Ong Decl. ¶ 7. While helpful in understanding the origin of the current system, this does not explain why chaplains for those five groups and not others were selected.

concerns. *Id.* ¶ 9. CDCR's policy is based on considerations across facilities, rather than the demand within a particular facility, in order to account for population shifts due to transfers.[18] *Id.* ¶ 10.

Defendants have tendered evidence that chaplains were hired for Protestant, Catholic, Jewish, Muslim, and Native American faiths based on these considerations. *Id.* ¶¶ 14, 16–23; *see also* Myers Decl. ¶¶ 24–25 (describing these considerations relative to PVSP). They have also tendered evidence that the liturgical needs of inmates of these faiths cannot be adequately served without paid chaplains. *See* Declaration of Timothy May in Support of Defs.' Mot. for Summ. J. ("May Decl.") ¶¶ 5, 7 (Protestant inmates); Declaration of Robert Ristad in Support of Defs.' Mot. for Summ. J. ("Ristad Decl.") ¶¶ 4–6 (same); Declaration of Claude Muncey in Support of Defs.' Mot. for Summ. J. ("Muncey Decl.") ¶ 3 (Catholic inmates); Moskowitz Decl. ¶¶ 5–12 (Jewish inmates); Abdul–Jabbaar Decl. ¶¶ 5–11 (Muslim inmates); Funmaker Decl. ¶¶ 5–14 (Native American inmates).

The evidence defendants have tendered is certainly some evidence that CDCR's provision of paid chaplains is closely fitted to its cost concerns, as there is evidence that its policy is based on population of the various inmates' faiths, availability of volunteer chaplains, and spiritual harm to the inmate if a chaplain or other spiritual leader is not available. *See id.*

The court cannot conclude, however, that defendants have shown this "close fit" as a matter of law. Although defendants have tendered evidence that paid chaplains may be necessary for the Protestant, Catholic, Muslim, Jewish, and Native American faiths, they have offered no evidence that paid chaplains are not necessary for in-

mates of other faiths based on similar considerations. Additionally, there is evidence that as recently as November 2008, CDCR indicated that it had never analyzed the liturgical needs of a particular inmate faith group to determine whether the paid chaplain positions for these five faith groups were warranted or whether a paid Pagan chaplaincy was warranted. *See* Wang Decl. Ex. 58 at 1 n. 2; *see also* Wang Decl. Ex. 57 at 4.

Moreover, plaintiffs have tendered evidence, as discussed above, that paid chaplains are given certain administrative privileges that volunteer chaplains are not. Defendants have not tendered evidence for the justification for this policy, nor that it is closely fitted to defendants' cost and administration concerns. In light of the stringent standard of the strict scrutiny test, the court is not persuaded that defendants have tendered sufficient evidence to show that they have satisfied it as a matter of law. Defendants' motion is therefore denied in this regard.

### 4. Establishment Clause Claim for Facially Neutral Policies

■ As discussed above, there is evidence from which a jury could reasonably find that defendants' policy at PVSP of announcing certain religious services does not manifest a denominational preference, but is neutral among religions. As the court explained in its September 16, 2008 order, facially neutral policies are analyzed under the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

■ Under the *Lemon* test, a state action does not offend the Establishment Clause if it has a secular purpose, if it does

---

**18.** Defendants have tendered evidence that the State Personnel Board defers to CDCR's determination of whether a chaplain of a particular faith is needed and grants or denies the request based on whether the agency has adequately shown that need exists. Ong Decl. ¶¶ 15–16.

not have the primary effect of advancing or inhibiting religion, and if it does not foster excessive entanglement with religion. 403 U.S. at 612–13, 91 S.Ct. 2105.

Here, defendants have not tendered sufficient evidence that these factors have been met, in particular that the announcement policy does not have the primary effect of advancing or inhibiting religion. Defendants have tendered almost no evidence on their announcement policy; the entirety of the evidence is a declaration by an officer, who states that announcements about religious services

> may or may not be made .... and there may be occasions when the officer does not announce every religious service because they are busy and overlook it. However, an announcement is not necessary to advise inmates of the time for religious services because services are scheduled for the same day and time each week, and inmates know the schedule.

Huckabay Decl. ¶ 5. This is minimal evidence that the announcement policy does not have the primary effect of advancing some religious practice or inhibiting others and does not establish that no reasonable jury could find in plaintiff's favor on the issue.

Accordingly, defendants' motion is denied as to plaintiff's third and sixth causes of action.

## D. Equal Protection

■ In his fourth and seventh causes of action, plaintiff alleges that defendants violated his Equal Protection rights under the United States and California Constitutions. These claims are analyzed together, as the Equal Protection clause under the California Constitution "provides substantially the same protection and evokes substantially the same standards as under the Fourteenth Amendment." *Cohan v. Al-*

*vord,* 162 Cal.App.3d 176, 181, 208 Cal. Rptr. 421 (1984) (citations omitted).

■ Under the Fourteenth Amendment, prison officials must offer all inmates reasonable, "comparable" opportunities to practice their faith and may not discriminate against adherent of some faiths in favor of those practicing "conventional religious precepts." *Cruz,* 405 U.S. at 322, 92 S.Ct. 1079; *see also Turner,* 482 U.S. at 84, 107 S.Ct. 2254 (acknowledging that prison inmates retain their Equal Protection rights under the Fourteenth Amendment). This does not require that every faith group be given identical accommodations in a prison. *Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. 1079. Instead, prison officials violate an inmate's equal protection rights where they acted in an intentionally discriminatory manner in failing to accommodate the inmate's rights in light of practical considerations. *Freeman v. Arpaio,* 125 F.3d 732 (9th Cir.1997) *rev'd on other grounds by Shakur,* 514 F.3d at 885; *Allen,* 827 F.2d at 569. A plaintiff may satisfy this burden by tendering evidence of disparate treatment sufficient to raise an inference of discriminatory purpose. *Freeman,* 125 F.3d at 737–39; *see also Allen,* 827 F.2d at 569. (adopting same approach).

In light of the evidence tendered, defendants' motion must fail. Plaintiff has tendered evidence that his practice of his Wiccan faith is impeded in ways that other religious practitioners are not, in defendants' denial of a paid chaplain, denial of his Witches Bible in Administrative Segregation in 1993, denial of access to a firepit and sweat lodge, denial of access to a chapel for a period of time, and policies regarding access to items from third-party vendors, use of lockers by religious groups, and announcements of religious services. *See* Rouser Decl. ¶¶ 49–50, 60, 61, 85, Second Rouser Decl. ¶ 4; Hysell Decl. ¶¶ 7–8, 9–10, 14–15; Irvin Decl. ¶ 17; Vann Decl.

¶3. As described above, plaintiff has tendered evidence that similar restrictions or policies were not applied to other faith groups. *See, e.g.,* Hysell Decl. ¶¶ 7–8, 14–15; Rouser Decl. ¶ 49–50, 61.

While defendants are not required to provide identical accommodations to inmates of every religious persuasion, *Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. 1079, the evidence of the differences in treatment of Wiccans and inmates of other faiths suffices to permit a jury to infer intentional animus and lack of good faith by defendants. In *Freeman,* the court found similar evidence sufficient to defeat defendants' motion for summary judgment on the issue of disparate treatment of inmates. 125 F.3d at 737–39. There, plaintiff was a Muslim and had tendered evidence that Muslim inmates were not released from their cells to attend religious services on some occasions and were shackled while being walked to their religious services, both of which were not done to inmates of other faiths. *Id.* at 737–78. Each of these instances of disparate treatment alone sufficed to raise a genuine issue of material fact on plaintiff's Equal Protection claim. *Id.* The same inference may reasonably be reached by a jury in this case.

*Allen,* on which defendants rely, is distinguishable. There, plaintiffs were Native American inmates who claimed that defendants violated their Equal Protection rights by failing to permit an inmate to lead a particular religious service, but rather requiring that service to be conducted by a volunteer spiritual leader, when available. *Allen,* 827 F.2d at 568–69. Plaintiffs argued that the denial inhibited their ability to obtain spiritual guidance and counseling, which members of other faiths enjoyed by virtue of having access to paid prison chaplains for their religions. *Id.* The court observed that there was no evidence that "any Native American inmate in the DSU has been denied access to spiritual counselors because of the unavailability of volunteer religious leaders." *Id.* at 569 n. 10. As such and because the prison's policy was to permit Native American religious volunteers to conduct the service in question, the court held that the district court did not err in holding that plaintiffs could not succeed on their Equal Protection claim. *Id.* at 569.

The evidence that the court held was absent in *Allen* is present here, as plaintiff has tendered evidence that the defendants' policies actually impede his ability to worship. For example, he has tendered evidence that defendants do not allow his access to a sweat lodge, which is allowed to Native American inmates. Rouser Decl. 61; Barnhardt Decl. ¶ 4. He also has tendered evidence, described in detail above, that defendants' denial of a paid chaplain has the practical effect of impeding his ability to worship in several ways. Thus, unlike the *Allen* plaintiff, the plaintiff has tendered evidence that defendants have not provided plaintiff reasonable worship opportunities comparable to those provided members of other faiths.[19] *See Cruz,* 405 U.S. at 322, 92 S.Ct. 1079.

Defendants' motion is therefore denied as to plaintiff's fourth and seventh causes of action.

**E. Qualified Immunity**

Defendants Gomez and White assert that they are entitled to qualified immunity on all of plaintiff's claims against them

19. There appears some confusion at the Court of Appeals as to whether *Turner* applies to Equal Protection claims brought by inmates. Compare *Shakur,* 514 F.3d at 885 (applying *Turner*) with *Freeman,* 125 F.3d at 737–39 (not applying *Turner*) and *Allen,* 827 F.2d at 568–69 (same). If the *Turner* analysis is required, the court has determined defendants have not met this standard in section III.B, *supra.*

in their individual capacities to the extent that plaintiff seeks damages. The court grants their motion in part on this basis.

 A government official is immune from liability for discretionary functions, so long as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The determination of whether or not a state official enjoys qualified immunity proceeds in two parts. First, the court must determine whether the facts show that the official's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the court undertakes the second step of the analysis, which is whether the constitutional right was "clearly established" at the time of the violation. *Id.* A right is clearly established if a reasonable official would have understood that his actions violated that right. *Id.* at 202, 121 S.Ct. 2151. The plaintiff bears the burden to show that the law regarding the Constitutional violation was settled at the time of the violation. *Gasho v. United States,* 39 F.3d 1420, 1438 (9th Cir.1994). This showing shifts the burden to the defendants to show that a reasonable official could have believed, in light of settled law, that his conduct did not violate the law. *Id.*

As described above, plaintiff asserts that defendants Gomez and White should be liable for damages for plaintiff's having been denied Tarot cards, candles, incense and access to a chapel in 1992 and being denied his Witches Bible while in Administrative Segregation in 1993. Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 26. Plaintiff has alleged his causes of action for viola-

tion of his Free Exercise rights, the Establishment Clause, and his Equal Protection Rights against defendants Gomez and White based on this conduct. *See id.*; TAC ¶¶ 49–82. The court considers each claim in turn.

## 1. Free Exercise

 As explained in section III.B., *supra,* a reasonable jury could find that defendants Gomez and White violated plaintiff's free exercise rights under the United States and California Constitutions by denying him access to Tarot cards, candles, incense, and access to a chapel. A reasonable jury could also find that defendant White violated plaintiff's free exercise rights for his involvement in resolution of plaintiff's 1993 grievance regarding access to his Witches Bible while in administrative segregation.

The law on this question was settled at the time of the deprivation, as *Turner,* setting forth a four part test for consideration of whether an inmate's Constitutional rights were violated, was decided in 1987. Moreover, prior to the plaintiff's 1992 grievance, the Ninth Circuit had utilized this test in considering whether certain restrictions on prisoner's Constitutional rights were valid. *See, e.g., Friend v. Kolodzieczak,* 923 F.2d 126, 127 (9th Cir. 1991); *Harper v. Wallingford,* 877 F.2d 728, 731–32 (9th Cir.1989); *Michenfelder v. Sumner,* 860 F.2d 328, 331 (9th Cir.1988). Although defendants cite cases in which prison officials were found to not have violated an inmate's free exercise rights by prohibiting him from having candles or Tarot cards, all of those cases applied the *Turner* factors and addressed evidence defendants had presented relative to those factors.[20] *Hysell v. Pliler,* No. CIV S–04–

---

20. Defendants also cite *Gelford v. Frank,* 310 Fed.Appx. 887, 888–89 (7th Cir.2008) in support of their argument. This case is not persuasive. There, the court held that plaintiff

had not shown that the items he sought were central to his religious practice. *Id.* at 889. This holding is not relevant to the instant case, where defendants have stated that they

0355, 2008 WL 149961 at *9 (E.D.Cal. Jan. 14, 2008) (Kellison, M.J.) recommendations adopted by 2008 WL 540153(Damrell, J.); *Auleta v. Goord,* No. 9:07–cv–0307, 2007 WL 2471728 at *6 (N.D.N.Y. Aug. 28, 2007); *Marx v. Larsen,* No. 7:02–cv–126–R, 2003 WL 22425032 at *3 (N.D.Tex. Sept. 24, 2003). As discussed above, defendants have not tendered any evidence on several of these factors in this case, nor is there any evidence that defendants Gomez and White considered the factors described in *Turner* when resolving plaintiff's grievances. Accordingly, the court concludes that the law was clearly established at the time of the alleged violation and defendants have not shown that their conduct was reasonable in light of settled law.

### 2. Establishment Clause

▮ Although plaintiff has not opposed defendant's motion on the Establishment Clause causes of action on the basis of his denial of Tarot cards, candles, incense, a Witches Bible, and access to a chapel, plaintiff has opposed defendants' motion as to the issue of qualified immunity on these grounds. To the extent that these allegations form the factual basis for his Establishment Clause claim, the court considers whether defendants Gomez and White are entitled to qualified immunity on them.

Under *Larson,* strict scrutiny applies to acts by prison officials that manifest a preference among religions. *Larson,* 456 U.S. at 246, 102 S.Ct. 1673. Preliminarily, plaintiff has not tendered any evidence from which a reasonable jury could conclude that defendants' denial of candles, incense, or Tarot cards demonstrates a denominations preference. *See* Pl.'s Response to Defs.' Statement of Undisputed Facts ¶¶ 108–109, 114–16; *see generally* Pl.'s Statement of Disputed Facts in Support of Opp'n to Defs.' Mot. for Summ. J. Plaintiff also has tendered no evidence relating to his denial of access to a chapel, asserted in his 1992 grievance, including evidence that this manifested a denominational preference. *See generally* Pl.'s Response to Defs.' Statement of Undisputed Facts; Pl.'s Statement of Disputed Facts in Support of Opp'n to Defs.' Mot. for Summ. J.

Plaintiff has tendered some evidence from which a jury could reasonably conclude, however, that defendant White's denial of a Witches Bible to plaintiff while he was in administrative segregation evinced a denominational preference.[21] Plaintiff has declared that he was not permitted a Witches Bible in administrative segregation, but that a Property Officer offered for him to have a "Christian Bible or a Quran." Rouser Decl. ¶ 26. He has also tendered evidence that, although access to the Witches Bible was denied on the basis of its references to human and animal sacrifice, the Christian Bible contains similar references. *See* Wang Decl. Ex. 61. From this, a jury could reasonably infer that defendant White denied plaintiff a Witches Bible out of a preference for certain religions over Wicca.

In denying plaintiff's access to a Witches Bible while in administrative segregation, prison officials cited safety concerns and the desire to avoid violence in the prison.

do not challenge the sincerity of plaintiff's beliefs and, more importantly, the Ninth Circuit has expressly declined to import into the Free Exercise analysis a requirement that the religious practice at issue must be central to the plaintiff's faith. *See Shakur,* 514 F.3d at 885.

**21.** As the court explained above, plaintiff has not tendered any evidence that defendant Gomez was involved in this decision such that liability would attach. As the court explained above, plaintiff has not tendered any evidence that defendant Gomez was involved in this decision such that liability would attach.

White Decl. Attachment 1. Safety and security in a prison are compelling state interests. *Cutter,* 544 U.S. at 725, n. 13, 125 S.Ct. 2113; *Greene,* 513 F.3d at 988. As explained above, however, under *Larson* a regulation of denominational preference must be "closely fitted" to the state's compelling interest. *Larson,* 456 U.S. at 246–47, 102 S.Ct. 1673. To make this showing, the state must produce facts to substantiate their assertions of a close fit between the interest and the regulation. *Id.* at 248–51, 102 S.Ct. 1673. Here, defendant White has tendered no evidence explaining the reasons for denying plaintiff a Witches Bible while offering him a Christian Bible, in light of their stated safety concerns. Nor is the connection between defendant's stated purpose and regulation immediately apparent to the court, as the Christian Bible contains violent descriptions and the regulation apparently only applied to plaintiff in administrative segregation, not general population. Therefore, based on the evidence tendered, a reasonable jury could find that defendant White's conduct violated the Establishment Clause with regards to the denial of the Witches Bible.

Moving to the second prong of the qualified immunity analysis, the Constitutional right was clearly established at the time such that a reasonable official in White's position would have understood his actions to violate that right. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. *Larson* was decided in 1982 and by the time of plaintiff's 1993 grievance had applied by courts in California. *See Walker v. Superior Court,* 47 Cal.3d 112, 253 Cal.Rptr. 1, 763 P.2d 852 (1988). Defendant has tendered no evidence or argument that his conduct may have been reasonable in light of the clearly established law at the time. Thus he is not entitled to qualified immunity on this claim.

### 3. Equal Protection

 As stated above, prison officials must offer all inmates reasonable, "comparable" opportunities to practice their faith and may not discriminate against adherent of some faiths in favor of those practicing "conventional religious precepts." *Cruz,* 405 U.S. at 322, 92 S.Ct. 1079. As in his Establishment Clause claim, plaintiff has not tendered evidence from which a jury could reasonably conclude that defendants' denial of Tarot cards, candles, incense, and access to a chapel in 1992 occurred in a manner that was not comparable to the accommodations given to other inmates or which would raise an inference of discriminatory intent. With regards to the denial of his access to a Witches Bible, as discussed in the context of his Establishment Clause claims, plaintiff has tendered some evidence from which a jury could reasonably conclude that he was denied religious accommodations that were provided to inmates of more "conventional" faiths. *See Cruz,* 405 U.S. at 322, 92 S.Ct. 1079.

The law on this question was clearly established at the time, as *Cruz* was decided in 1972 and had been applied in the religious freedom context in 1987 in *Allen,* 827 F.2d at 568–69. Defendant has not offered any evidence or argument that his conduct was reasonable in light of the settled law. Therefore his motion must be denied as to these causes of action to the extent that they are based on denial of plaintiff's 1993 grievance relating to access to a Witches Bible.

### F. Injunctive Relief

 Plaintiff seeks injunctive relief on all of his claims, which defendants argue is not warranted because plaintiff has not shown evidence of a "very significant possibility of future harm." *Bras v. Cal. Pub. Util. Comm'n,* 59 F.3d 869, 873 (9th Cir. 1995). Defendants argue that, aside from

plaintiff's request for a paid chaplain, all of his other complaints have been satisfied and do not require injunctive relief. As detailed herein, there is evidence tendered from which a factfinder could conclude that this is not the case. Although defendants have tendered some evidence of a change in their policies to facilitate plaintiff's access to religious items and group worship, plaintiff has tendered evidence that these policies have not accomplished that goal. For example, plaintiff has tendered evidence that the new process for approval of orders from vendors has not made those approvals occur more quickly than they did previously. Rouser Decl. ¶ 60. Plaintiff has also tendered some evidence, for example, that defendants have not in fact changed the way in which religious groups have access to their items in lockers. Second Rouser Decl. ¶ 4; Hysell Decl. ¶¶ 7–8; Irvin Decl. ¶ 17; Vann Decl. ¶ 3. Finally, were the factfinder to credit even some of plaintiff's evidence of the violations he has suffered since 1992 in attempting to exercise his religious rights, a factfinder could infer a pattern of Constitutional violations sufficient to call into question the permanence of any changes defendants have voluntarily made now.

Accordingly, defendants' motion is denied on the issue of injunctive relief.

## IV. CONCLUSION

For the reasons stated herein, defendants' motion is DENIED as to defendants Cate and Yates and GRANTED IN PART AND DENIED IN PART, as set forth above, as to defendants White and Gomez.

IT IS SO ORDERED.